08-2157-op

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: May 27, 2008      Decided: September 17, 2008)

Docket No. 08-2157-op

--------------------------------------

In re VINCENT BASCIANO,

Petitioner.

--------------------------------------

Before:   KEARSE, LEVAL, and SACK, Circuit Judges.

The United States District Court for the Eastern District of New York (Nicholas G. Garaufis, Judge) denied the petitioner's motions seeking the judge's recusal based on government-furnished evidence suggesting that the petitioner had plotted to have the judge murdered.  The petitioner then filed a petition for a writ of mandamus in this Court asking us to order Judge Garaufis to recuse himself.

Petition denied.

JANE SIMKIN SMITH (Ephraim Savitt, Richard Jasper, Ying Stafford, New York, NY, of counsel), Millbrook, NY, for Petitioner;

JOHN BURETTA, Assistant United States Attorney (Benton J. Campbell, United States Attorney for the Eastern District of New York, Peter A. Norling, Amy Busa, Winston Chan, Assistant United States Attorneys, of counsel), Brooklyn, NY, for Respondent United States.

SACK, Circuit Judge:

Petitioner Vincent Basciano petitions for a writ of mandamus requiring Judge Nicholas G. Garaufis of the United States District Court for the Eastern District of New York to recuse himself from presiding over Basciano's impending capital trial.  In an order dated June 11, 2008, we denied Basciano's petition, stating that an opinion would follow.  This is that opinion.

**BACKGROUND**

Basciano, allegedly a highly placed member of the Bonanno crime family, see United States v. Basciano, 369 F. Supp. 2d 344, 351 (E.D.N.Y. 2005) (Garaufis, J.) ("Basciano"), was originally indicted on August 14, 2003 for various racketeering-related offenses.  Following several superseding indictments and two trials on these indictments in 2006 and 2007, Basciano was found guilty of charges in each.  On March 31, 2008, he was sentenced to life imprisonment.  See Judgment as to Vincent Basciano, United States v. Massino, No. 03-cr-0929 (E.D.N.Y. Apr. 8, 2008).

In January 2005, while awaiting trial, Basciano was placed in the Special Housing Unit ("SHU") at the Metropolitan Detention Center ("MDC") in Brooklyn.  Basciano v. Lindsay, 530 F. Supp. 2d 435, 438 (E.D.N.Y. 2008) (Garaufis, J.) ("Lindsay").  In a separate indictment returned shortly thereafter, on January 26, 2005, Basciano was charged with, among other things, "Murder in Aid of Racketeering," 18 U.S.C. §§ 1959(a)(1)-(2), 3551 et

2

seq., based on the 2004 death of Randolph Pizzolo. See Indictment, United States v. Basciano, No. 05-cr-060 (E.D.N.Y. Jan. 26, 2005). The indictment alleges that Basciano conspired to murder the Assistant United States Attorney, Greg Andres, who had been the lead prosecutor in the earlier cases. See Lindsay, 530 F. Supp. 2d at 438. The government has stated its intent to seek the death penalty on these still-pending charges. See Letter Regarding Attorney General's Death Penalty Decision, Basciano, No. 05-cr-060 (E.D.N.Y. Apr. 2, 2007). It is trial on these charges for which Basciano has sought to have Judge Garaufis recuse himself.

Two months after this indictment was filed, in March 2005, Basciano was moved from the MDC to Unit 10 South[1] at the Metropolitan Correctional Center ("MCC") in Manhattan. See Lindsay, 530 F. Supp. 2d at 438.

> While housed in Unit 10 South, Basciano's contact with visitors, including his attorneys, was sharply curtailed based on the Government's contention that the conditions were necessary to prevent Basciano from directing the affairs of the Bonanno crime family from prison, including ordering acts of violence. Specifically, the Government argued that, in addition to his involvement in the plot to kill Andres, Basciano had ordered the Pizzolo murder from the MDC.

Id. (citations omitted).

---

[1] "[Unit 10 South] at the [MCC] is considered the most secure housing unit available at any Bureau of Prisons ("BOP") facility in the New York City Metropolitan Area and is generally reserved for terrorism suspects and other inmates considered to be a danger to other inmates and/or prison guards." Lindsay, 530 F. Supp. 2d at 438.

In May 2005, however, the district court "f[ound] that Basciano's detention in the SHU [was] not reasonably related to the government's legitimate objective of curtailing [his] alleged criminal activities, and that less restrictive means of doing so [were] available to the government." Basciano, 369 F. Supp. 2d at 353. Basciano was therefore released by order of the district court into the general prison population of the MCC subject to "such restrictions as the government deem[ed] necessary to prevent him from communicating with other Bonnano family members and associates." Id.[2]

In July 2006, however, Basciano was transferred by the Bureau of Prisons from the general prisoner population at the MCC back to Unit 10 South. At the end of the following month, the government disclosed to the district court, under seal, the reasons for the transfer.

In its sealed filing, the government asserted that in April or May 2006, Basciano had composed a handwritten list with

---

[2] The district court also noted that the earlier conditions of confinement imposed by the government were hampering Basciano's ability to fight the government's efforts to have the death penalty imposed against him. The court remarked that, "[a]s a practical matter, the security restrictions in place in the SHU ma[d]e it much more difficult for Basciano to have productive meetings with his counsel," and that "long periods of solitary confinement can have devastating effects on the mental well-being of a detainee." Lindsay, 530 F. Supp. 2d at 439 (quoting Basciano, 369 F. Supp. 2d at 352-53)(internal quotation marks omitted). The court concluded that the "'nuclear option' of indefinite solitary confinement [in the SHU]" was inappropriate "until it [wa]s clear that less restrictive options ha[d] failed to constrain Basciano." Basciano, 369 F. Supp. 2d at 353.

4

the names of Judge Garaufis, Assistant United States Attorney Andres, and three cooperating witnesses who had testified at trial. According to the government, Basciano gave this list to another inmate and indicated that he wanted to have the listed individuals murdered. The second inmate took no further action regarding the list, however, eventually turning it over to the government on June 30, 2006.

The government later produced a transcript of a telephone conversation between Basciano and his wife, which the government had intercepted on June 8, 2006. It took place sometime after the putative "hit list" had been prepared and delivered, but before it had been disclosed to the government by the inmate recipient. The transcript reads, in part:

> **Basciano**: I'm going to try to get a different judge. I'm gonna see if I can get a different judge. . . . [H]e's just so predisposed because the government brought in so many witnesses. [The government] can't handle the fact that I might get acquitted. . . . [T]hey brought in so many witnesses and spent so much money. I have to pull all the rabbits out of my hat for this one. . . . I gotta pull all the rabbit[s], I have to fight the same way they fight, honey. . . .

> **Angela Basciano**: Try to get a different judge.

> **Basciano**: Yeah, well I don't know if it's going to be possible. But I thought this judge was okay . . . . Al[l] right listen to me, I'm pulling every rabbit out of the hat, and, uh, I gotta fight fire with fire with these people.

> **Angela Basciano**: Yeah, well that's what you've got to do.

5

Exhibit B to Memorandum of Law in Opposition to the Motions To Recuse by Defendants, Basciano, Nos. 03-cr-0929, 05-cr-0060 (E.D.N.Y. Nov. 1, 2006).

Basciano disputed the government's characterization of the list. At a status conference held August 28, 2006, he contended that it was created for use in a Santeria ritual[3] that required the list to be placed in his right shoe and stomped on five times per day during the course of trial. Basciano requested an evidentiary hearing regarding the nature of the list. The district court denied the request.[4]

On September 21, 2006, the government informed Basciano and his counsel that it had received authorization from the Attorney General to impose stringent Special Administrative Measures ("SAMs") on Basciano. See Lindsay, 530 F. Supp. 2d at 439. Federal regulations provide that the Bureau of Prisons may implement SAMs, "[u]pon direction of the Attorney General," when "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a).

On January 30, 2007, Basciano filed a habeas corpus petition pursuant to 28 U.S.C. § 2241 challenging his transfer back to the SHU and the imposition of the SAMs. The district

---

[3] Santeria is an Afro-Cuban religious cult. XIV Oxford English Dictionary 468 (2d ed. 1989).

[4] If Basciano is correct that the list was part of a Santeria ritual and not a "hit list," there is simply no reason for the district court to recuse itself. Thus, the district court did not need to hold an evidentiary hearing on the "hit list" to decide the recusal motion.

court denied the petition in 2008, making no finding as to whether Basciano's list was a "hit list." The court found sufficient evidence, independent of the list, of "Basciano's dangerousness to justify the Government's safety concerns" underlying the government's decision both to impose the SAMs and to assign Basciano to the SHU.[5] Lindsay, 530 F. Supp. 2d at 447.

Recusal Motions

In the meantime, in October 2006, Basciano filed a motion requesting that Judge Garaufis recuse himself from presiding over Basciano's capital case. See Motion for Recusal, Basciano, No. 05-cr-0060 (E.D.N.Y. Oct. 31, 2006) (the "2006 Motion"). He renewed this motion in June 2007 in connection with his habeas petition, and again in February 2008, following the government's notice that it intended to introduce Basciano's list of names during a potential penalty phase of trial, and that it might also introduce the list as evidence during the guilt phase, see Motion for Hearing or Alternately for Recusal of the Court, Basciano, No. 05-cr-0060 (E.D.N.Y. Feb. 12, 2008) (the "2008 Motion").

The district court denied all of these motions. In an order dated November 30, 2006, responding to the 2006 Motion, the court determined that recusal under 28 U.S.C. § 455(a), which provides that "[a]ny . . . [federal] judge . . . shall disqualify

---

[5]This evidence included testimony at Basciano's 2006 trial regarding his role in the Bonanno crime family, as well as evidence of his discussions of plans to murder three people, including Assistant United States Attorney Andres. See Lindsay, 530 F. Supp. 2d at 440-442, 446-447.

himself in any proceeding in which his impartiality might reasonably be questioned," was not warranted. United States v. Basciano, Nos. 03-cr-929, 05-cr-060, 2006 WL 3483924, at *1-2, 2006 U.S. Dist. LEXIS 86533, at *5 (E.D.N.Y. Nov. 30, 2006) (Garaufis, J.). Observing that Basciano was a "sophisticated party" as evidenced by his regular replacement of counsel, and that the first recusal motion followed both his racketeering conviction and statement to his wife about seeking a "different judge," id. at *2, 2006 U.S. Dist. LEXIS 86533, at *5-6 (internal quotation marks omitted), the district court found that Basciano had sought to "engineer" the judge's recusal, id., 2006 U.S. Dist. LEXIS 86533, at *6 (internal quotation marks omitted). In the absence of actual bias manifested by the court, the court concluded that a reasonable person "would not reasonably question th[e] court's impartiality." Id., 2006 U.S. Dist. LEXIS 86533, at *7.

In a memorandum and order dated March 24, 2008, responding to a motion for a new trial, the district judge reaffirmed his decision not to recuse himself and added that neither that decision nor his denial of habeas relief created "an appearance of partiality sufficient to call into question the fairness of Basciano's retrial." United States v. Basciano, No. 03-CR-0929, 2008 WL 794945, at *10, 2008 U.S. Dist. LEXIS 23107, at *36 (E.D.N.Y. Mar. 24, 2008) (Garaufis, J.). The court noted that the defendant had pointed to decisions adverse to him, but had failed to identify any pattern of actions by the court that

8

would contribute to an appearance of an absence of impartiality. Id. at *11, 2008 U.S. Dist. LEXIS 23107, at *41.

The court reaffirmed its recusal decision yet again, for substantially the same reasons, in an order dated April 3, 2008. See Order Denying Motion for Evidentiary Hearing and Renewed Motion for Recusal as to Vincent Basciano, Basciano, No. 05-cr-0060 (E.D.N.Y. Apr. 3, 2008). Basciano then filed in this Court the instant petition seeking a writ of mandamus.

**DISCUSSION**

I.   Standard of Review

A petition for a writ of mandamus based on a district judge's refusal to recuse himself requires that we consider both the standard for issuance of the writ and the standard for review of the recusal decision itself. See In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988), cert. denied, 490 U.S. 1102 (1989).

"[I]t is well-settled that the exceptional remedy of mandamus will only be invoked where the petitioner has demonstrated that its right to such relief is 'clear and indisputable.'" Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 18 (1983)) (emphasis omitted). The district judge has discretion "in the first instance to determine whether to disqualify himself." Id. We will overturn the court's determination in that regard only if it constitutes an abuse of discretion. Id. The recusal decision requires that the district court "carefully weigh the policy of promoting

9

public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid" the adverse consequences of his expected adverse decisions. Id.

In order for us to issue the writ, the petitioner therefore "must 'clearly and indisputably' demonstrate that the district court abused its discretion. Absent such a showing, mandamus will not lie." Id. at 1312-13.

II. Whether the District Judge Abused His Discretion By Refusing To Recuse Himself

A judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "[T]his test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary." United States v. Amico, 486 F.3d 764, 775 (2d Cir. 2007). In applying this test, we consider the petitioner's allegations of bias as well as the judge's "rulings on and conduct regarding them," id., and ask whether "an objective, disinterested observer[,] fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal," id. (quoting United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992)) (internal quotation marks omitted).

Although a plot or threat, real or feigned, may create a situation in which a judge must recuse himself, see United States v. Greenspan, 26 F.3d 1001 (10th Cir. 1994), recusal is not ordinarily or routinely required. See, e.g., United States v. Holland, 519 F.3d 909, 915-916 (9th Cir. 2008) (concluding

recusal not required); United States v. Yousef, 327 F.3d 56, 170 (2d Cir.) cert. denied, 540 U.S. 933 (2003) (same); United States v. Yu-Leung, 51 F.3d 1116, 1120 (2d Cir. 1995) (same); United States v. Cooley, 1 F.3d 985, 993-94 (10th Cir. 1993) (same) (listing among "matters . . . which will not ordinarily satisfy the requirements for disqualification under 455(a)," "threats or other attempts to intimidate the judge"); United States v. Studley, 783 F.2d 934, 940 (9th Cir. 1986) (concluding recusal not required); United States v. Grismore, 564 F.2d 929, 934 (10th Cir. 1977) (same), cert. denied, 435 U.S. 954 (1978). Even where a threat is serious, then, a judge may appropriately decline to recuse himself, at least in some circumstances.

To determine whether a trial judge must recuse himself on learning of evidence that the defendant has plotted or threatened to kill him (or someone close to him), we must focus first on whether "an objective, disinterested observer[,] fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." Amico, 486 F.3d at 775. Depending on the facts, it might reasonably be argued that a judge who becomes aware of a defendant's credible plot or threat to kill him is likely to be adversely influenced in further rulings in that defendant's case. Cf. Greenspan, 26 F.3d at 1005-06.[6] And in some circumstances that might counsel

[6] We are wary of the approach taken by the Tenth Circuit in Greenspan, which focused largely on the seriousness of the threat rather than the evidence of resulting bias. That would suggest that a person awaiting trial must mount not only a threat, but a serious one, in order to obtain a new trial judge. Even so, the

11

recusal. If, for example, a judge was assigned to hear a criminal case involving a defendant who had previously threatened the judge, the judge might well be required to recuse himself.

But in the situation here, where there is a significant possibility that the defendant's purpose in at least appearing to plot against the judge was to change judges either through physical attack or recusal, additional serious concerns arise. Requiring a judge to recuse himself because the defendant, in an attempt to change judges, has plotted or threatened to kill him would provide any defendant who wanted a new judge with an effective, if in some cases dreadful, method to achieve that end.

---

Court noted that the threat at issue had apparently resulted in questionable actions taken by the trial court with respect to the sentencing of the defendant.

> The trial [judge who was the subject of the defendant's threat] was aware of the allegations at the sentencing hearing, and in fact expedited the hearing in order to "get [the defendant] into the federal penitentiary system immediately, where he can be monitored more closely." [And] the trial court refused to continue the sentencing hearing at the request of defendant's counsel, who had been appointed only two days before the expedited sentencing date.

Greenspan, 26 F.3d at 1005.

We should not be misunderstood as suggesting that the nature of a plot or threat is irrelevant. An idle malicious comment by a person awaiting trial is worlds away from a full-fledged conspiracy to assassinate a judge. We would expect the judicial behavior of a judge to be more likely to be affected by the latter than the former. It is, however, but one factor. The principal indicium of whether a judge's "impartiality might reasonably be questioned," we think, is whether judicial action subsequently taken by the judge with respect to the defendant in the wake of his or her discovery of the plot or threat does or does not appear to be impartial.

12

A defendant cannot be permitted to use such a plot or threat as a judge-shopping device. See In re Aquinda, 241 F.3d 194, 201-02 (2d Cir. 2001) (civil action); see also Holland, 519 F.3d at 915 ("Such blatant manipulation would subvert our processes, undermine our notions of fair play and justice, and damage the public's perception of the judiciary."). In the circumstance presented here, we give particular deference to the decision of the district judge.

In this case, then, we look first to the manner in which the district judge decided not to recuse himself, employing an "abuse of discretion" standard of review. The district judge came to his decision meticulously. As noted, Basciano made or renewed his motion for recusal on three separate occasions. On each, the court explained precisely why the motion was being denied. We have no reason to doubt the manner in which the judge came to his conclusion.

Second, we review the actions of the district court to see whether the defendant's behavior has resulted in actions by the judge which might be viewed by "an objective, disinterested observer" as evidencing bias. The only actions identified by Basciano here are the district court's rulings refusing to hold an evidentiary hearing as to the alleged plot, denying the petitioner's motions to recuse, and declining to decide whether the list of persons ostensibly identified as targets reflected a serious threat. That evidence establishes no more than that the court ruled against Basciano; it does not reveal partiality. See

13

Yousef, 327 F.3d at 170 ("[W]ere we to hold that [the district court] had an inherent conflict of interest as a result of his prior ruling, we would essentially be requiring district judges to recuse themselves anytime they were asked to revisit a prior decision. . . . [And] the Supreme Court has held that judicial rulings and the opinions formed by judges on the basis of facts introduced in the course of proceedings almost never constitute a valid basis for a bias or partiality motion . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." (citation and internal quotation marks omitted)).

We conclude that the district judge did not abuse his discretion by declining to recuse himself.

III.   Whether Recusal Is Required If
       the List Is Admitted as Evidence

The petitioner also insists that we direct the district judge to recuse himself because of the possibility that the admission of the list into evidence in a trial presided over by the judge may prejudice the jury.  We decline to address this argument for lack of ripeness.

"Two factors inform our analysis of prudential ripeness:  1) the fitness of the issues for judicial decision; and 2) the hardship to the parties of withholding court consideration."  Ehrenfeld v. Mahfouz, 489 F.3d 542, 546 (2d Cir. 2007) (citation and internal quotation marks omitted).  Although the government has indicated its intent to introduce the list as evidence during one or more phases of trial, the defendant has

14

not yet challenged the admissibility of this evidence, nor has the district court made any ruling in this regard. And the hardships identified by petitioner arising from our withholding consideration of this question at this time -- his potential interest in questioning jurors regarding the list during voir dire and the potential use of the list as part of his defense -- are too speculative for us to act upon the assertion now. The degree and nature of the difficulties Basciano might face are themselves dependent on, among other things, the admissibility of Basciano's list as evidence and the government's actual use thereof at trial. The factors bearing on this issue can be understood only in the fullness of time.

The district court has not determined, moreover, whether it would recuse itself if the list were admitted as evidence. In the absence of a decision by the district court on this issue, there is no exercise of discretion before us that we may examine for abuse. We need not and do not express any view, or intend to imply one, as to whether recusal might then, depending on the circumstances, be appropriate or necessary.[7]

## CONCLUSION

For the foregoing reasons, on June 11, 2008, we denied Basciano's petition for a writ of mandamus.

---

[7] The district court may wish to consider ruling on the admissibility of the "hit list" in limine so as to explore, before trial begins, all available options including, but not limited to, disallowing the use of the list, recusal, or redacting the potentially prejudicial portions of the list, such as the names of the judge and the prosecutor.