2013 VT 65

# State of Vermont v. Robert E. Zorn

[88 A.3d 1164]

No. 12-019

Present: Dooley, Burgess and Robinson, JJ., and Bent, Supr, J. and Johnson, J. (Ret.), Specially Assigned

Opinion Filed August 9, 2013

Motion for Reargument Denied January 9, 2014

*Marc D. Brierre*, Rutland County State's Attorney, Rutland, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Joshua S. O'Hara*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Robert E. Zorn appeals the superior court's order involuntarily hospitalizing him for a period of ninety days pursuant to 13 V.S.A. § 4822.[1] Defendant first contends that the hospitalization order was improper because there was insufficient evidence to establish that he was a person in need of treatment as defined under 18 V.S.A. § 7101(17). Specifically, defendant argues that the trial court lacked substantial evidence of a causal connection between his delusional disorder and the risk of harm he posed to others. Second, defendant argues that Judge Teachout should have disqualified herself from the hospitalization hearing because her ruling swept her into the class of people she found to be in reasonable fear of harm as a result of defendant's mental illness. We affirm.

¶ 2. On March 31, 2011, defendant was charged with one count of simple assault and one count of resisting arrest. The State alleged that on March 30, 2011, defendant went uninvited to attorney Herbert Ogden's office in Danby. Attorney Ogden represents defendant's brothers in a contested estate matter against defendant. Defendant demanded that attorney Ogden pay defendant money that he alleged that attorney Ogden owed him. Not obtaining immediate satisfaction, defendant punched attorney Ogden in the jaw and attempted to hold his arms behind his back and place him under arrest. After repeatedly being told to leave by attorney Ogden, defendant ultimately left the office.

¶ 3. After defendant left, attorney Ogden complained to the police, and two Vermont State Police Troopers responded and obtained a sworn written statement from him. Based on the statement, the troopers located defendant and stopped him while he was driving his car. Defendant immediately stepped out of his vehicle and proceeded to walk in the direction of the police vehicle. After disregarding the troopers' multiple commands to return to his vehicle or get on his knees, defendant stated that he could not get on his knees and sat on his rear. The troopers then commanded that defendant lie down on his stomach and put his hands out on his side, and defendant once again failed to comply with their directions. Consequently, one of the troopers deployed

---

[1] The superior court's hospitalization order also found defendant not competent to stand trial for the criminal offense for which he is charged, pursuant to 13 V.S.A. § 4817, in that he suffers from a persecutory type of delusional disorder. Defendant appeals only the portion of the order involuntarily hospitalizing him under 13 V.S.A. § 4822.

his taser. The trooper was then able to secure defendant's hands and take him into custody.

¶ 4. The troopers found two rifles with clips and ammunition in defendant's vehicle. After the traffic stop, defendant advised that he was having neck and knee pains from a preexisting injury. An ambulance was contacted, and defendant was transported to the Rutland Regional Medical Center. Defendant was subsequently evaluated at the hospital and released into State Police custody.

¶ 5. The next day, March 31, 2011, defendant was arraigned before a superior judge on one count of simple assault and resisting arrest. During the arraignment, a social worker who had screened defendant that day testified that, in her opinion, defendant was a person in need of treatment and recommended that he have an inpatient evaluation at the Vermont State Hospital. At the conclusion of the arraignment, the judge ordered, pursuant to 13 V.S.A. § 4815(g), an inpatient competency evaluation of defendant.

¶ 6. Dr. Paul Cotton, a forensic psychiatrist, examined defendant at the Vermont State Hospital on April 6, 2011, and determined that he was incompetent to stand trial and insane at the time of the offense. The doctor put his findings into a formal report that day. At a bail review hearing on April 15, 2011, the court, relying on Dr. Cotton's report, set the matter for a competency hearing.

¶ 7. Dr. Cotton's April 6, 2011 report, which formed the basis for the court's decision at the competency hearing, diagnosed defendant with a psychotic disorder characterized by delusional belief and disorganized thought processing and found him mentally incompetent to stand trial. The report observed that defendant's delusional beliefs focused on a wide range of persons who defendant believes are conspiring against him. During his evaluation, defendant described his belief that his brothers and attorney Ogden, with the help of the superior judge who was presiding over the probate matter, falsified records and forged his mother's will. Additionally, defendant claimed that the State had "illegally seized" his mother and taken her off life support, leading to her death. Defendant also believed that Dr. Cotton was unfit to perform the examination because defendant was suing officers of the State and Dr. Cotton was reimbursed by the State. The report further noted that State Hospital records indicated that defendant has long believed that the State is systematically persecuting him. Accordingly, Dr. Cotton determined that defendant was not mentally competent to stand trial because he lacked a sufficient

rational understanding of the legal proceedings and would not be able to consult with his attorney with a reasonable degree of rational understanding.

¶ 8. At the competency hearing on June 12, 2011, the trial court agreed with Dr. Cotton's findings that defendant was not mentally competent to stand trial. The court found that defendant lacked a rational understanding of the proceedings against him and that defendant's ability to consult with his attorney with a reasonable degree of rational understanding would be impaired because of defendant's preoccupation with his persistent delusional beliefs. The court set the matter for a hospitalization hearing.[2]

¶ 9. After learning that Judge Mary Teachout would be presiding over defendant's case, defendant moved on December 14, 2011 to recuse her because she was named as a defendant in a civil suit defendant had filed in federal court.[3] Administrative Judge Amy Davenport denied defendant's motion because he failed to make "a clear and affirmative showing of bias or partiality."

¶ 10. In making that ruling, Judge Davenport relied heavily on *Ball v. Melsur Corp.*, 161 Vt. 35, 633 A.2d 705 (1993). In that case, this Court affirmed the administrative judge's denial of the defendant's motion for disqualification of the trial judge, holding that there is no per se rule mandating recusal where the judge is the subject of a judicial complaint filed by an attorney who is appearing in the case before the judge. *Id.* at 39, 633 A.2d at 709. Here, Judge Davenport reasoned that, similar to the situation in *Ball*, a per se lack of impartiality does not arise solely because the judge is or has been the subject of a lawsuit brought by the litigant who seeks the judge's recusal. Judge Davenport further

[2] The judge set the matter for a hospitalization hearing but no date was specified. The hearing was eventually held on August 23, 2011, but defendant failed to appear. At a December 15, 2011 motion hearing before a new judge, defendant claimed that he never received notice of the August 23 hearing. The judge made clear to defendant that he was required to appear at the rescheduled hospitalization hearing at 9:00 AM on December 22, 2011.

[3] See *Zorn v. Vermont*, No. 1:11-cv-221-jgm, 2011 WL 4748255, at *1 (D. Vt. Oct. 6, 2011). Defendant initiated the action in the United States District Court for the Northern District of New York on August 19, 2011. *Id.* The case was subsequently transferred to the District of Vermont on September 14, 2011 because of improper venue. *Id.* The United States District Court for the District of Vermont dismissed the case, *id.* at *3 (dismissing with prejudice), and at the time of the motion to recuse, defendant had appealed to the United States Court of Appeals for the Second Circuit.

explained that the policy consideration cited by this Court in *Ball* — that recusal should not be mandated every time a judge is the subject of a judicial complaint because then an attorney or litigant "need only file a complaint, possibly groundless, to avoid a particular judge thereafter" — applies when a litigant sues a judge as well. *Id.*

¶ 11. Before the hospitalization hearing, Dr. Cotton reexamined defendant and on December 21, 2011, filed a new competency report, which concluded that defendant remained incompetent to stand trial. The report did not cover any other issue.[4] The report found, similar to the earlier report, that defendant suffers from a persecutory type of delusional disorder. Defendant's thought content was characterized by delusional beliefs about a conspiracy of others to violate his legal rights. Attorney Ogden, the state police, the "court," and Dr. Cotton are some of the persons defendant noted as part of a conspiracy against him. Defendant's delusional beliefs are persistent and prolonged. Further, defendant is preoccupied by his fixed delusional beliefs and does not acknowledge his difficulty. During the evaluation, defendant's responses to some of the questions were irrelevant and focused on his delusional beliefs.

¶ 12. After Judge Davenport denied defendant's motion and at the beginning of the December 22, 2011 hospitalization hearing, Judge Teachout noted that the court had been presented with a proposed stipulation requesting the nonhospitalization of defendant. She explained, however, that the court could not accept the stipulation as there was not sufficient information to support a conclusion of nonhospitalization. Accordingly, the court went forward with the hearing.

¶ 13. Dr. Cotton testified at the hospitalization hearing as to the contents of his report, and the report, along with the earlier one, was admitted into evidence. The other witness at the hearing was attorney Ogden. In addition to testifying about the alleged assault, attorney Ogden testified that he had previously received a voicemail from defendant in which the defendant threatened to harm him.

---

[4] The report was ordered at a December 15, 2011 hearing at the request of the prosecution and was specifically limited to whether defendant was competent to stand trial. Accordingly, Dr. Cotton's new report did not evaluate whether defendant was insane at the time of the alleged offenses.

¶ 14. At the conclusion of the hearing, the trial court found that defendant's March 30, 2011 assault of attorney Ogden was related to defendant's contested estate litigation with his brothers in which attorney Ogden is involved. The court confirmed that during the alleged assault defendant demanded that attorney Ogden pay him the money that he believed that attorney Ogden owed him as a result of the estate litigation. The court found that defendant's capacity for self-control and his judgment is so lessened that, with respect to persons involved in the subject matter of his delusion — a conspiracy to violate his legal rights — defendant does pose a risk of harm as a result of his disorder.[5] This risk of harm is particularly focused on persons related to defendant's legal matters. The court stated that this delusion did not end with the March 30 incident; defendant continues to be preoccupied with the subject as demonstrated by Dr. Cotton's December report. Thus, defendant's condition is unchanged, and his delusional beliefs are fixed.

¶ 15. Based on the findings, Judge Teachout concluded that defendant was a "person in need of treatment" as defined by 18 V.S.A. § 7107(17) in that he has been shown to suffer from a mental illness, and as a result of that mental illness, has a diminished capacity to exercise self-control or judgment. Based on this conclusion, the court issued a hospitalization order pursuant to 13 V.S.A. § 4822(a), committing defendant to the custody of the Commissioner of Mental Health for a period not exceeding ninety days.

¶ 16. On appeal, defendant argues that the hospitalization order was improper because there was insufficient evidence to establish that defendant was a person in need of treatment as defined under 18 V.S.A. § 7101(17). Specifically, defendant asserts that the evidence did not support a causal connection between his mental illness and the alleged offenses.

¶ 17. ▮ The court must consider commitment if a defendant is reported by an examining psychiatrist following examination "to have been insane at the time of the alleged offense" or if the court finds defendant to "be incompetent to stand trial due to a

---

[5] In making its ruling, the court reiterated the findings of Dr. Cotton's December 21, 2011 report. Although the court did not mention in its findings the section of Dr. Cotton's April 6 report finding defendant insane at the time of the offense, this was in the record, admitted as evidence.

mental disease or mental defect." 13 V.S.A. § 4820(1), (2). Both of these triggers were present here.[6] In order to involuntarily hospitalize a defendant in a criminal case, the court must find that defendant is "a person in need of treatment or a patient in need of further treatment." 13 V.S.A. § 4822(a). This is the same standard that is used to determine whether a proposed patient will be committed in a civil proceeding. See 18 V.S.A. § 7617(b); see also 13 V.S.A. § 4821 (stating that procedures in hearings under chapter 181 of Title 18 apply in criminal commitment hearings for defendants who are mentally ill). A "person in need of treatment" is defined in § 7101(17) as:

> [A] person who is suffering from mental illness and, *as a result of that mental illness*, his or her capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations is so lessened that he or she poses a danger of harm to himself, to herself, or to others . . . .

18 V.S.A. § 7101(17) (emphasis added). Pursuant to 18 V.S.A. § 7616(b), the State bears the burden of proving its case by clear and convincing evidence in a civil commitment. We have held that this standard of proof also applies to a commitment proceeding in a criminal case. See *State v. McCarty*, 2006 VT 4, ¶ 12, 179 Vt. 593, 892 A.2d 250 (mem.). In this case, the court had to find that the State had shown, by clear and convincing evidence, that defendant suffers from a mental illness and presents a danger of harm to himself or others as a result of his mental illness. The court made the finding here.

¶ 18. ▇ This Court has held that the clear and convincing evidence standard requires proof that the existence of a contested fact is highly probable rather than merely more probable than not. *In re N.H.*, 168 Vt. 508, 512, 724 A.2d 467, 470 (1998). "Clear and convincing does not mean, however, that the State's evidence must be wholly uncontradicted or unimpeached." *Id.* at 512, 724 A.2d at 470. Furthermore, this Court will uphold the superior court's findings as long as there is substantial evidence to support such findings even though they may be contradicted. *Id.* (citing *Vermont Women's Health Ctr. v. Operation Rescue*, 159 Vt. 141, 147, 617 A.2d 411, 414 (1992)). The test, as articulated in *In re*

---

[6] There are two other triggers, not applicable here. See 13 V.S.A. § 4820(3), (4).

*N.H.*, is "whether the factfinder could reasonably have concluded that the required factual predicate was highly probable." *Id.* at 512-13, 724 A.2d at 470 (citing *Taylor v. Comm'r of Mental Health*, 481 A.2d 139, 153 (Me. 1984)); see also *State v. McCarty*, 2006 VT 4, ¶ 12. Thus, we view the evidence in the light most favorable to the State and affirm the superior court's findings " 'if the evidence fairly and reasonably supports that finding.' " *In re N.H.*, 168 Vt. at 513, 724 A.2d at 470 (quoting *Operation Rescue*, 159 Vt. at 147, 617 A.2d at 415).

¶ 19. Defendant argues on appeal that the court could not make the necessary findings based on the evidence presented. Specifically, defendant argues that the court could not find the causal connection between defendant's mental illness and the conclusion that he is dangerous to others, see 18 V.S.A. § 7101(17) (dangerousness must be present "as a result of that mental illness"), because he claims that Dr. Cotton did not provide an opinion on whether defendant's dangerousness was caused by his mental illness and his testimony related to defendant's competency to stand trial and not his dangerousness. We have looked at the sufficiency of the evidence to show causation between mental illness and dangerousness in two recent decisions — *State v. J.S.*, 174 Vt. 619, 817 A.2d 53 (2002) (mem.), and *McCarty*, 2006 VT 4. In *J.S.*, the State claimed that defendant engaged in erratic driving as a result of delusions that he was being poisoned by phosphorous. The trial court concluded that the erratic driving was caused by the delusions. We noted: "To the extent that the district court was required to infer any part of its factual conclusion, we presume that the court properly inferred the connection between appellant's mental illness and his erratic driving from its sound factual findings." *J.S.*, 174 Vt. at 621, 817 A.2d at 56.

¶ 20. In *McCarty*, defendant was charged with resisting arrest for struggling violently while she was being arrested for failing to appear to answer a charge of truancy. In a hospitalization hearing, the evidence was the testimony of the officers about her violent struggles and Dr. Cotton who opined that defendant was incompetent to stand trial and insane at the time of the offense and that the mental illness made defendant violent. In arguing that the evidence was insufficient, defendant attacked Dr. Cotton's opinions as conclusory and speculative. *McCarty*, 2006 VT 4, ¶ 14. We rejected that argument and held that the superior court

reasonably concluded that defendant posed a risk of harm as a result of her mental illness due to its "synthesi[s of] valid findings." *Id.* ¶ 13.

¶ 21. ■ We recognize that in this case Dr. Cotton was never asked whether defendant was dangerous to himself or others or whether the dangerousness was a result of defendant's mental illness. Nevertheless, there was substantial evidence to support the trial court's findings.

¶ 22. Both of Dr. Cotton's reports found defendant suffers from a psychotic disorder characterized by delusional beliefs and disorganized thought processing. The reports concluded that defendant's delusional beliefs focused on a wide range of persons who were conspiring against him to violate his legal rights — specifically, defendant believed those involved in his legal matters were conspiring against him. This class of people included attorney Ogden because he represented defendant's brothers in a contested family estate matter.

¶ 23. The most important evidence was Dr. Cotton's opinion, contained in his first report, that defendant was "insane at the time of the alleged offenses." Dr. Cotton explained the test for insanity: "A person is not responsible for criminal conduct if at the time such conduct is the result of mental disease or defect and he lacks the substantial capacity to appreciate the criminality or wrongfulness of his conduct or conform his conduct to the requirements of the law." He opined that defendant had a mental disease that was "active at the time of his alleged offenses" and he could not conform his conduct to the requirements of the law either at the roadside when stopped by the police or in attorney Ogden's office. This report directly tied defendant's violent behavior to his mental illness and was a sufficient basis for the court to find the causal connection. The trial court's hospitalization order was supported by its findings which, in turn, were supported by the evidence.

¶ 24. ■ We now address defendant's claim that Judge Teachout should have disqualified herself from the hospitalization proceedings because her factual findings included her in the class of people she found to be in reasonable fear of harm as a result of defendant's mental illness. This claim is based on the court's finding that defendant's actions "placed others in reasonable fear of physical harm to themselves: Herbert Ogden and others

associated with his fixed delusions about a conspiracy."[7] We conclude that this claim was not properly preserved, as defendant raises it only on appeal.[8] See *DeLeonardis v. Page*, 2010 VT 52, ¶ 31, 188 Vt. 94, 998 A.2d 1072 (where litigant fails to seek disqualification of trial judge in trial court, issue is not preserved for appeal; decided under V.R.C.P. 40(e)).

¶ 25. V.R.Cr.P. 50(d)(1) states, in relevant part: "A motion for disqualification of a judge shall be made *as soon as practicable after the cause or ground becomes known.*"[9] (emphasis added). Defendant claims that it was not until Judge Teachout's ruling at the hospitalization hearing that he had knowledge of the grounds for her disqualification — that she was among the class of people found to be in reasonable fear of harm from defendant. He argues that this should excuse him from any requirement to have sought recusal earlier.

¶ 26. ■ In this case, the alleged ground for disqualification of Judge Teachout — that she may be considered to be in the class

---

[7] Judge Teachout made oral findings on the record, which made this same point, also without specifying who "others" were. We assume, for purposes of defendant's argument, that the "others" included the presiding judge, although that is an inference drawn by defendant.

[8] As discussed above, defendant had earlier moved to disqualify Judge Teachout because he had filed a federal civil suit against her. Administrative Judge Davenport denied the motion. On appeal, however, defendant does not challenge Judge Davenport's denial of the motion he made in the superior court. Rather, defendant raises a new claim for Judge Teachout's disqualification that was not raised below.

[9] The rule goes on to state that a motion filed "in violation of this paragraph" shall not be denied for this reason, but the violation may be grounds for sanctions against the lawyer or party who filed it. The identical language appears in V.R.C.P. 40(e)(1), and the Reporter's Notes to that rule indicate that the intent is that a motion to disqualify not be denied "on account of its tardiness." Reporter's Notes — 1988 Amendment, V.R.C.P. 40. We do not believe that this language affects the requirement of preservation. Preservation was required to raise judicial disqualification claims on appeal before the addition of the recusal procedure in the civil, criminal and probate rules, see *In re B.L.*, 145 Vt. 586, 590, 494 A.2d 145, 147 (1985), and we held in *DeLeonardis*, after the recusal provisions were added to the rules, that preservation remained a requirement. See 2010 VT 52, ¶ 31. Similarly, appellate court decisions have required that litigants preserve recusal issues under 28 U.S.C. § 144, which states that an affidavit demonstrating the bias of a judge "shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time." See *United States v. De La Fuente*, 548 F.2d 528, 541 (5th Cir. 1977).

of people in reasonable fear of defendant as a result of mental illness — would have been known to defendant long before the hospitalization order was made. It was of no surprise that defendant had sued Judge Teachout in federal district court along with a number of other Vermont judges or that Judge Teachout had imposed Rule 11 sanctions on defendant twice before. See *Zorn*, 2011 WL 4748255; see also *Zorn v. Smith*, 2011 VT 10, ¶ 18, 189 Vt. 219, 19 A.3d 112; *Zorn v. Ryan*, No. 2008-445, 2009 WL 2413733, at *1 (Vt. Apr. 15, 2009) (unpub. mem.). That Judge Teachout is involved in litigation with defendant was public information. Furthermore, given defendant's fixed delusional belief of a conspiracy against him by those involved in his legal matters, which was addressed in both of Dr. Cotton's reports, defendant was aware of the possible grounds for disqualification of Judge Teachout as soon as she was assigned to his case. Therefore, if he seriously wished to pursue disqualification on these grounds, defendant should have moved for her disqualification prior to the hospitalization hearing.

¶ 27. ■■ Even without the special circumstances involved in this case, defendant's position on when the grounds for disqualification arose and his theory on the grounds for disqualification are in conflict. The Vermont Code of Judicial Conduct requires a judge to disqualify himself or herself when "the judge's impartiality might reasonably be questioned." Vermont Code of Judicial Conduct, A.O. 10, Canon 3(E)(1). This standard is met, if at all, when the judge faces a decision that may be influenced by improper factors, not after the judge has made the decision. Thus, in this instance, the impropriety, if any, is in sitting on a case where the result might put the judge in danger; not in ordering commitment or in finding defendant was dangerous to her. Defendant failed to make a motion to disqualify before Judge Teachout decided to sit on the hospitalization hearing.

¶ 28. Defendant cites *Velardo v. Ovitt*, 2007 VT 69, 182 Vt. 180, 933 A.2d 227, decided under the similar civil rule, arguing that it stands for the proposition that when the grounds for disqualification arise after all questions of fact have been resolved, this Court must address the merits of a claim of disqualification and apply a "recusal standard," regardless of whether a motion for disqualification was made below. Defendant's reliance on *Velardo* is misplaced. *Velardo* was a case where the grounds for disqualification were not known at the time of the proceedings in the lower

court. Further, the administrative judge refused to rule on a disqualification motion because the proceedings before the trial court were completed, requiring this Court to confront whether the lower court judgment should be reversed because of the judge's conflict of interest. Here, there was no attempt to go to the administrative judge with a timely motion.

¶ 29. ■ However, even if defendant's argument were properly preserved, recusal was not necessary in the case below. This Court outlined the standard for claims that a judge should have been disqualified in *Leonard v. Willcox*, 101 Vt. 195, 142 A. 762 (1928): " '[I]t must appear that it is the judge who is prejudiced against the party, and not that it is the party who is prejudiced against the judge' "; *id.* at 215, 142 A. at 771 (quoting *State v. Grinstead*, 64 P. 49, 51 (Kan. 1901)), and the existence of bias against the respondent "must be clearly established by the record." *Id.* In order to color a claim of judicial disqualification for the presiding judge, "[a] defendant must affirmatively show bias or prejudice directed against him." *State v. Beshaw*, 134 Vt. 347, 351, 359 A.2d 654, 656 (1976).

¶ 30. ■ Recusal is rarely required when a judge has been threatened by a criminal defendant. See, e.g., *In re Basciano*, 542 F.3d 950, 956-57 (2d Cir. 2008) (concluding recusal not required); *United States v. Holland*, 519 F.3d 909, 912-13 (9th Cir. 2008) (same). *Basciano* held that recusal was not necessary even after the presiding judge in a capital case was discovered to be on a "hit-list" authored by the defendant. 542 F.3d at 955-58. The court held that even in situations where a defendant lodges a serious threat against a presiding judge, that judge may still decline to recuse himself. *Id.* at 956. Allowing such judicial discretion curbs the ability of parties to use threats as a means of judge-shopping. *Id.* at 957. The need for recusal following defendant threats is only present in exceptional circumstances where " 'an objective, disinterested observer[,] fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal.' " *Id.* at 956 (quoting *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007)).

¶ 31. An example of a case where recusal was warranted from a defendant's threats is *United States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994). The defendant in *Greenspan* was able to demonstrate that knowledge of a threat appeared to play a role in the

presiding judge's decision to accelerate sentencing and refusal to grant a continuance after the defendant had acquired new counsel a mere two days prior to the sentencing hearing. *Id.* at 1007.

¶ 32. ██ ██ In the present case, defendant failed to present any evidence of bias or prejudice caused by defendant's "threat" against Judge Teachout.[10] It is, necessarily, the job of a judge to deal with litigants who are disruptive and even threatening. Even where a threat is aimed at a judge, it is expected that the judge can fairly preside and make the decisions presented. Defendant's contention that Judge Teachout was included in the threatened class of "others" is speculative at best. Even if Judge Teachout were a member of the class of people placed in reasonable fear of defendant, this fact alone would not be grounds for recusal. A disinterested, objective observer would not conclude that injustice would result if the judge continued to sit after a threat. Defendant's argument that the judge was required to recuse herself is without merit.

*Affirmed.*

---

[10] We have held above that defendant failed to preserve this challenge. The failure also undermines the substance of the challenge because there are no facts that would take this out of the general rule that threats alone will not require recusal.