In the Supreme Court of Georgia

Decided:   March 21, 2016

S15A1510.  BATTLE v. THE STATE.

NAHMIAS, Justice.

Appellant Maurice Murray Battle was convicted of the malice murder of Dipak Patel, the aggravated assault of Johnny Owens and Willie Griffin, and other crimes in connection with an armed robbery of a convenience store. Appellant contends that the evidence was legally insufficient to support his convictions; that the trial judge erred in not recusing himself from the case after learning of Appellant's alleged plot to kill him; and that Appellant's trial counsel provided ineffective assistance by not filing a motion for recusal of the trial judge.  For the reasons that follow, we affirm.[1]

---

[1]  The robbery occurred on August 30, 2009.  On April 6, 2010, a Bibb County grand jury indicted Appellant, Rashard Harris, and Korey Stephens for malice murder, felony murder, armed robbery, two counts of aggravated assault, and possession of a firearm during the commission of a felony.  On May 25, 2010, the State filed a notice of intent to seek the death penalty against Appellant, which it withdrew on March 15, 2012.  In July 2012, Harris pled guilty to armed robbery and possession of a firearm during the commission of a crime; Stephens pled guilty to armed robbery, aggravated assault, and possession of a firearm during the commission of a crime; and both men agreed to testify against Appellant.  At a trial from July 30 to August 2, 2012, the jury found Appellant guilty of all charges.  The trial court held a sentencing hearing on August 16 and on August 22 sentenced Appellant to serve life in prison without the possibility of parole for malice

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On the night of August 30, 2009, Appellant and two of his housemates, Rashard Harris and Korey Stephens, devised a plan to rob a Chevron gas station and convenience store in Macon. Stephens drove, dropping off Appellant and Harris near the store as manager Dipak Patel and clerk Wendy Patterson were starting to close up for the night. Appellant and Harris entered the store wearing bandanas, head coverings, and gloves to conceal their identities, and Appellant, who was armed with a .22-caliber rifle, shouted that this was a robbery. Harris went around behind the counter with a blue and black book bag while Appellant held Patel, Patterson, and two customers, Johnny Owens and Willie Griffin, at gunpoint.

Harris initially had difficulty getting into the cash register, so Appellant, who was giving all the orders, told Patterson to help Harris and then "announced that this [isn't] a regular robbery, this is a one eighty-seven" – slang for a

murder, life in prison for armed robbery, 20 years for each of the aggravated assaults, and five years for the firearm charge, with all sentences to run consecutively; the felony murder verdict was vacated by operation of law. On August 20, 2012, Appellant filed a premature motion for new trial, which he amended with the assistance of new counsel on September 4, 2014. The trial court held an evidentiary hearing on September 5, 2014, and denied Appellant's motion on October 14, 2014. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the September 2015 term and submitted for decision on the briefs.

homicide. Harris stuffed money from the cash register, cigars, and cigarettes into the book bag and ran out of the store to Stephens's waiting car. Appellant then fired a single shot at Patel, who was standing still with his hands above his head, before running out after Harris. The bullet pierced Patel's right lung and heart, and he died shortly thereafter.

Stephens drove Appellant and Harris home, where the men divvied up the money from the cash register. Neilisa Waller, Stephens's live-in girlfriend, described the scene as follows:

> They pull a blue and black bookbag, brought it in the room, and poured the money and stuff on the bed. And all you hear is [Appellant] yelling I'm going to get my first teardrop, I'm going to get my first teardrop. . . . It means that you murdered someone.

The robbery was depicted from multiple angles on the store's video surveillance system. Three days after the shooting, the police released portions of the surveillance video to the media. Appellant and Harris began to worry about getting caught, so they buried the rifle and book bag in woods near their house. The police soon received anonymous tips from two people who recognized Appellant and Harris from the video, and Appellant, Harris, Stephens, and Waller were brought in for questioning. Harris and Stephens

3

implicated themselves and Appellant in the robbery, but Appellant denied any involvement. Waller also denied any involvement in the crimes but implicated Appellant, Harris, and Stephens. The police arrested Appellant, Harris, and Stephens.

In a telephone call from the jail that was recorded, Appellant told Waller where the rifle was hidden, and the police used this information to recover the rifle and book bag that Appellant and Harris had buried in the woods. A GBI firearms examiner testified that a spent cartridge case found at the crime scene was fired from the rifle. At trial, the store surveillance video was played for the jury, and Harris, Stephens, and Waller identified Appellant as the man shown shooting Patel in the video. Patterson, Owens, and Griffin also testified at trial but did not identify Appellant.

Appellant contends that the evidence at trial was vague, ambiguous, and conflicting, pointing to the jury's requests during its deliberations that the store surveillance video and recorded telephone call be replayed. However, "'[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) (citation omitted). When viewed in the light most

4

favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). Accordingly, we reject Appellant's challenge to the sufficiency of the evidence.

2. Appellant's other arguments all involve his assertion that the trial judge should have recused himself from the case based on an alleged plot by Appellant to kill the judge and several others involved with the case. We will outline the facts relevant to these arguments before addressing their merits.

The crimes occurred in August 2009. Prosecutors Sandra Matson and Elizabeth Bobbitt of the Macon Judicial Circuit District Attorney's Office were assigned to the case, and Appellant was indicted in April 2010. In May 2010, the State filed a notice of intent to seek the death penalty, and the case was assigned to Judge Edgar W. Ennis, Jr. In July 2010, Brad Gardner of the Georgia Capital Defender's Office entered his appearance as lead counsel for Appellant. Gardner had been an attorney since 2000, had served as defense counsel in death penalty cases, and had tried more than 30 murder cases, 25 of them as lead counsel.

On November 10, 2010, Judge Ennis held a preliminary status conference. A few days later, Matson and Bobbitt told Gardner that the D.A.'s Office had received information from an attorney for Frederick Edwards, an inmate housed in the same cellblock as Appellant at the Bibb County Jail, related to an alleged plot by Appellant to have five people associated with his case killed using explosives – Judge Ennis, Matson, Bobbitt, the lead detective, and Waller. Edwards told his attorney about the alleged plot and gave the attorney several papers that he claimed Appellant had given him to send to Appellant's mother so that the plot could be carried out at a later date by people outside the jail. The papers, which Edwards's attorney turned over the D.A.'s Office, consisted of handwritten sketches showing the location of the entrance to a private elevator at the courthouse that goes directly to Matson's and Bobbitt's offices; a printout of a picture of Waller; and what appeared to be "plans and orders of events leading to the attack" with codes supposedly identifying the five targets.

A police investigator interviewed Appellant, who denied Edwards's claims. After interviewing Edwards twice, interviewing two other inmates on the same cellblock, and obtaining letters known to be written by Appellant, Edwards, and one of the other inmates he interviewed, the investigator told

Matson and Bobbitt that he would not feel comfortable testifying in court that Appellant was actually plotting to have Judge Ennis and the others killed, because all he really had was the word of one inmate accusing another inmate.

In December 2010, the investigator sent the letters written by Appellant, Edwards, and the other inmate to the GBI Crime Lab for handwriting comparison to the papers that Edwards's attorney had provided. On February 21, 2011, a GBI examiner reported that while there were some similarities between the writing in Appellant's letter and the papers from Edwards's attorney, he could not testify that the writing on the papers was Appellant's; he could, however, testify that the writing on the papers was not Edwards's or the other inmate's. The investigator thought that with this new information, he had enough evidence to seek arrest warrants against Appellant.

On March 17, 2011, Appellant was arraigned on the indictment in this case. A week later, the police investigator obtained arrest warrants against Appellant for conspiracy to commit murder against Judge Ennis, Matson, Bobbitt, and the lead detective in this case (but not Waller). After speaking with the investigator and his supervisor, Gardner had the impression that they did not think that the alleged plot was credible, and after researching the issue of

7

recusal, discussing the matter with his co-counsel, and talking with Appellant, Gardner made a strategic decision not to seek Judge Ennis's recusal and instead to seek to disqualify the District Attorney's Office. Neither Gardner nor Appellant had any concerns about Judge Ennis's rulings or his impartiality. Gardner was concerned, however, that the State would try to use the allegations about the plot as non-statutory aggravating circumstances during the sentencing phase of Appellant's death penalty trial, and Matson and Bobbitt, two of the targets of the alleged conspiracy, would be the persons standing in front of the jury asking the jurors to sentence Appellant to death. Gardner sought the disqualification of the entire D.A.'s Office, and not just Matson and Bobbitt, because the decision to continue to seek the death penalty against Appellant was totally within the discretion of the District Attorney, whose employees were targets of the alleged plot and who had been in contact with the investigator about the progress of the conspiracy investigation and whether or not the investigator should seek arrest warrants.

On June 15, 2011, the District Attorney's Office decided to drop the

conspiracy charges due to insufficient evidence.[2]  At a status conference in August 2011, Gardner informed Judge Ennis that if the case moved forward as a death penalty case, Appellant would be filing a motion to disqualify the D.A.'s Office, and Appellant filed such a motion on November 3, 2011.  At a status conference on March 15, 2012, Matson informed the court that after the August status conference, Gardner had given the State a copy of the motion to disqualify the D.A.'s Office that he planned to file along with substantial discovery regarding Appellant's history of mental health issues.  Matson said that after reviewing the case and the new discovery, the State had agreed to withdraw its notice of intent to seek the death penalty if Appellant withdrew his motion to disqualify the D.A.'s Office.  Gardner confirmed the agreement, noting that the motion to disqualify was based on concerns regarding the sentencing phase of the case as a death penalty case.  After the status conference, Appellant filed a motion to withdraw his motion to disqualify the D.A.'s Office, which Judge Ennis granted, and the State then filed a notice of withdrawal of its notice to seek the death penalty.  Appellant's trial started on July 30, 2012.

---

[2] The record does not specify when the charges actually were dismissed.

(a)     Appellant contends that Judge Ennis erred in not recusing himself from the case sua sponte when he learned about the alleged plot by Appellant to have him killed.  It is undisputed, however, that Appellant did not file a timely motion to recuse the judge.  See Post v. State, 298 Ga. 241, 243 (779 SE2d 624) (2015) ("To be timely, a recusal motion and accompanying affidavit must be filed and presented to the judge 'not later than five (5) days after the affiant first learned of the alleged grounds' for the judge's recusal 'and not later than ten (10) days prior to the hearing or trial which is the subject of [the] recusal.'  USCR 25.1." (alteration in original)).  Appellant knew about the alleged plot by November 2010, but he waited until after he had been tried, convicted, and sentenced to raise the recusal issue, which he first asserted in his September 2014 amended motion for new trial.  Under these circumstances, Appellant forfeited the right to raise the sua sponte recusal issue on appeal.  See In re Adams, 292 Ga. 617, 617 (740 SE2d 134) (2013).

As we explained in State v. Hargis, 294 Ga. 818 (756 SE2d 529) (2014):

> Even after [the defendant] learned of the grounds for the potential disqualification of the trial judge, he apparently decided to take his chances with the same judge . . . .  That was his choice to make, but he could not do so and still preserve the disqualification issue for review in the appellate courts.  To hold otherwise would be to

10

sanction gamesmanship. . . . The idea that a party could allow a judge whom the party believes to be disqualified to continue to preside over the case without objection, only later to urge the disqualification, is inconsistent with the principles of fair play and judicial economy that are embodied in the requirement that a motion to recuse be filed promptly.

Id. at 822-823 (citations omitted). See also GeorgiaCarry.org, Inc. v. Jones, Case No. S15A1901, 2016 WL 369369, at *1-3 (Ga. Feb. 1, 2016).

(b) Moreover, even assuming that a trial judge's failure to recuse sua sponte could in some rare instances constitute reversible error even though the parties knew of the grounds for recusal and did not seek the judge's recusal in a timely and proper way, there was no reversible error in this case.[3] Absent extraordinary circumstances, threats or plots by a criminal defendant against the judge presiding over his case – even serious ones – do not mandate the judge's recusal. See In re Basciano, 542 F3d 950, 956 (2d Cir. 2008) (collecting cases).[4]

_____

[3] This Court's holdings in cases like Adams and Hargis are in some tension with a line of Court of Appeals decisions suggesting that appellate courts may in certain narrow circumstances review a defendant's claim that a trial judge committed reversible error by failing to recuse sua sponte despite the absence of a timely recusal motion. See, e.g., Ellicott v. State, 320 Ga. App. 729, 734-735 (740 SE2d 716) (2013). Our alternative holding in this subdivision makes it unnecessary to resolve that tension in this case. We also reiterate that holdings regarding a litigant's legal right to dispute a judge's recusal decisions at trial or on appeal should not be viewed as diminishing the judge's ethical duty to recuse sua sponte anytime the judge becomes aware of facts requiring recusal. See Gude v. State, 289 Ga. 46, 50 (709 SE2d 206) (2011).

[4] The federal cases on this issue typically apply 28 USC § 455 (a), which requires federal judges to disqualify themselves "in any proceeding in which [their] impartiality might reasonably

11

As the Ninth Circuit put it in <u>United States v. Holland</u>, 519 F3d 909 (9th Cir. 2008), if threats or plots of violence against judges ordinarily sufficed to require recusal,

> defendants could readily manipulate the system, threatening every jurist assigned on the 'wheel' until the defendant gets a judge he preferred. Also, the defendant could force delays, perhaps making the cases against him more difficult to try, perhaps putting witnesses at greater risk. Such blatant manipulation would subvert our processes, undermine our notions of fair play and justice, and damage the public's perception of the judiciary.

Id. at 915.

In this case, as Judge Ennis explained in his order denying Appellant's motion for new trial, there was little to suggest that the alleged plot, if it existed at all, was serious or actionable or that Judge Ennis ever thought that it was realistic.[5] It also appears that the D.A.'s Office and Appellant's own trial counsel (who had access to his client) concluded that the alleged plot, which was investigated and resolved well before Appellant's trial began, did not present a

be questioned." This standard corresponds to the default recusal standard for Georgia judges found in Canon 3 (E) (1) of the version of the Georgia Code of Judicial Conduct applicable at the time of Appellant's trial, as well as Rule 2.11 (A) of the revised version that took effect on January 1, 2016.

[5] Indeed, it is unclear from the record when Judge Ennis learned of the alleged plot, although Gardner assumed that the judge was aware of it early on and we may proceed on the same assumption.

credible threat of harm to anyone. Under these circumstances, Judge Ennis would not have been required to recuse even if a timely and proper recusal motion based on the alleged plot against him had been filed. See United States v. Yu-Leung, 51 F3d 1116, 1119-1120 (2d Cir. 1995) (holding that the trial judge did not err in failing to recuse sua sponte where the judge "never made any statements or any other indications that would suggest that he considered the [defendant's] death threats to be serious").

Appellant relies heavily on United States v. Greenspan, 26 F3d 1001 (10th Cir. 1994), in which the Tenth Circuit held that the trial judge's recusal was required despite the lack of a formal recusal motion where the judge was made aware after the defendant's conviction but prior to his sentencing that the defendant had contracted with third parties to kill the judge and his family. See id. at 1005-1007. Greenspan is a clear outlier among cases dealing with recusal based on threats against a judge by a criminal defendant, and its approach has been questioned by other courts. See State v. Riordan, 209 P3d 773, 776 (N.M. 2009); Basciano, 542 F3d at 957 n.6. See also United States v. Cooley, 1 F3d 985, 993-994 (10th Cir. 1993) (recognizing that "threats or other attempts to intimidate the judge" are matters that "will not ordinarily satisfy the

requirements for disqualification").

In any event, Greenspan is factually distinguished from this case. The record in Greenspan showed that: (1) the defendant in that case and several others had engaged in a conspiracy across several states to kill the trial judge and his family by contributing "large sums of money" to hire a "hitman"; (2) the FBI investigated the threats, of which the trial judge was aware; and (3) after learning of the threats, the judge expedited the defendant's sentencing hearing and refused to continue the hearing at the request of defendant's new counsel, who was appointed only two days before the sentencing date, in order to ensure that the defendant would be moved to the federal penitentiary system where he could be monitored more closely. Greenspan, 26 F3d at 1005. In light of the judge's knowledge of credible threats, his acceleration of the defendant's sentencing hearing, and his refusal to grant a continuance despite new counsel, along with the government's concession that "a reasonable person might have questioned the judge's impartiality," the Tenth Circuit concluded that the "totality of the circumstances . . . contributed to an appearance that the trial court was prejudiced against [the defendant]." Id. at 1006.

As explained above, in this case there is little to indicate that the alleged

14

plot by Appellant to kill Judge Ennis was serious or credible or that Judge Ennis believed that it was. Moreover, Appellant points to no allegedly improper rulings by Judge Ennis that might have been motivated by bias resulting from the threat. See Basciano, 542 F3d at 957. And the State does not concede that the judge's recusal was necessary. Accordingly, even if Greenspan was correctly decided, Appellant is not entitled to a new trial.

(c) Finally, Appellant repackages his recusal claim as an argument that his experienced lead trial counsel, Brad Gardner, provided ineffective assistance by not filing a timely motion for Judge Ennis's recusal after learning about Appellant's alleged plot to kill the judge and the prosecutors assigned to the case. To prevail on this claim, Appellant must show that his counsel's performance was professionally deficient and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See Strickland v. Washington, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984); Long v. State, 287 Ga. 886, 891 (700 SE2d 399) (2010). Appellant's claim does not satisfy either part of this test.

As discussed previously, Gardner spoke with the police investigator and

his supervisor about the alleged plot by Appellant, and those discussions left Gardner with the impression that they did not think that the plot was credible. Gardner then researched the recusal issue, discussed the matter with co-counsel, and spoke with Appellant, who denied the allegations, before making the strategic decision not to seek Judge Ennis's recusal and instead to seek to disqualify the D.A.'s Office. "Counsel's trial tactics and strategic decisions will not support a claim for ineffective assistance unless they were so patently unreasonable that no competent attorney would have chosen them." Schutt v. State, 292 Ga. 625, 627 (740 SE2d 163) (2013) (citation and punctuation omitted).

With both the death penalty and the new conspiracy-to-murder charges against Appellant looming, Gardner moved to disqualify the D.A.'s Office in an attempt to convince the State to withdraw its intent to seek the death penalty. This strategy ultimately proved successful, and the death penalty notice and motion to disqualify were both withdrawn. Gardner testified at the motion for new trial hearing that he knew that he could move for Judge Ennis's recusal but made the deliberate, strategic decision not to do so because Judge Ennis had not made any rulings that Gardner thought were improper, Appellant had not raised

16

any concerns about Judge Ellis's impartiality, Judge Ennis had not expressed any concern about the alleged plot, and Gardner's research suggested that a recusal motion would likely fail. Gardner also thought that, given the overwhelming evidence of Appellant's guilt, having a different judge preside over the case would not result in a different outcome. In light of these circumstances, Appellant has failed to show that Gardner's strategic decision not to file a timely motion seeking Judge's Ennis's recusal was patently unreasonable, and Appellant therefore has failed to prove deficient performance.

In addition, Appellant has not demonstrated that if a timely motion to recuse Judge Ellis had been filed, there is a reasonable probability that the outcome of the proceedings would have been more favorable to him. As explained in the previous subdivision, Judge Ennis would not have been required to recuse even if Gardner had filed a timely motion seeking his recusal. Moreover, Gardner testified at the motion for new trial hearing that he did not believe that Judge Ennis made any improper rulings at trial, and even now Appellant points to no allegedly improper rulings that might have been motivated by bias on the part of Judge Ennis. Furthermore, the jury had no knowledge of the alleged plot, and the evidence of Appellant's guilt was

17

overwhelming.  Accordingly, Appellant failed to prove <u>Strickland</u> prejudice.

    <u>Judgment affirmed.  All the Justices concur.</u>