# IN THE COURT OF APPEALS OF IOWA

No. 14-1162
Filed October 28, 2015

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DANIEL JASON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Johnson County, Paul D. Miller, Judge.

Daniel Jason appeals his convictions and sentences for extortion and stalking, challenging the sufficiency of the evidence and the fairness of his sentences, among other things.  **AFFIRMED.**

Mark C. Meyer, Cedar Rapids, for appellant.

Daniel Jason, Clarinda, pro se.

Thomas J. Miller, Attorney General, Darrel Mullins, Assistant Attorney General, Janet Lyness, County Attorney, and Beth Beglin and Anne Lahey, Assistant County Attorneys, for appellee.

Considered by Doyle, P.J., and Mullins and Bower, JJ.

**PER CURIAM.**

Daniel Jason appeals his convictions and sentences for one count of stalking while restricted by a court order and two counts of extortion, all as a habitual offender. He challenges the sufficiency of the evidence and the fairness of his sentences, among other things. We affirm.

### I. Background Facts and Proceedings.

Daniel Jason is an intelligent man with a photographic memory. When he was fifteen, he was diagnosed with Asperger's Syndrome, a high-functioning autistic spectrum disorder. Jason explained the disorder "impairs [one's] ability to interact with others, to understand social cues, to have eye contact, to understand the [reciprocity] in social relationships and people's feelings . . . . Also some . . . problems with impulse control."

Cynthia Courter met Jason in early 2005 while both were in college, and the two began a relationship. *See State v. Jason*, 779 N.W.2d 66, 68 (Iowa Ct. App. 2009). Though Courter ended the relationship around early 2006, and despite the entry of a no-contact order in November 2006, Jason has continued to be a presence in her life against her wishes by way of harassment and intimidation, to put it mildly. *See id.* at 68-69. Detailed facts concerning Jason's numerous unwanted actions and behaviors towards Courter from the time of their break-up until he was incarcerated in approximately March 2007 can be found in our 2009 opinion involving Jason's direct appeal of his related criminal convictions. *See id.*

Relevant here, Jason was first convicted in February 2007 of simple assault and three counts of harassment concerning his unwanted actions toward

Courter. *See id.* at 69. He also stipulated at that time to having violated the existing no-contact order. *Id.* Jason received a suspended sentence of 120 days in jail, and the no-contact order was extended for five years. *See id.* Contrary to Jason's declaration at that sentencing hearing that he would never contact Courter again, he sent her an email a few hours after he was released. *See id.*

Jason's unwanted activities towards Courter continued, and in April 2007, he was charged with stalking while restricted by a court order, a class "D" felony, in violation of Iowa Code sections 708.11(2) and 708.11(3)(b) (2007), and tampering with a witness, an aggravated misdemeanor, in violation of section 720.4. During those criminal proceedings, Jason's competency was challenged. *See id.* at 70-71. Specifically, Jason's trial attorney contended Jason was "suffering from a mental disorder which prevent[ed] him from appreciating the charge, understanding the proceedings, or assisting effectively in the defense." *Id.* at 70. Jason was evaluated by psychologist Frank Gersh, who found "Jason was competent to stand trial," "understood the role of all the parties in the prosecution and was 'involved in planning trial strategy' with his attorney." *Id.* at 71. Jason's testimony at the competency hearing "demonstrated a comprehension of the process," and he was found to be competent to stand trial. *Id.*

Jason then requested to represent himself. *See id.* After the court's extensive colloquy with Jason and advice that he reconsider, Jason persisted, and the court permitted Jason to proceed pro se but appointed standby counsel. *See id.* Following a jury trial, Jason was convicted as charged. *See id.*

Thereafter, Jason filed a motion seeking a new trial, arguing the court erred in allowing him to represent himself, among other things. *See id.* at 72. The district court denied the motion and sentenced Jason to an indeterminate term of five years on the stalking conviction and an indeterminate term of two years on the tampering conviction, with the sentences to be served consecutively. *See id.* The no-contact order was to remain in effect until May 2013.

Jason had no contact with Courter while he was in prison. He was released May 30, 2012, and nine days later, he sent Courter an email, starting her ordeal all over again. In November 2012, the State filed a trial information charging Jason with three criminal counts, all as a habitual offender pursuant to Iowa Code section 902.8 (2011), based upon his 2008 felony stalking conviction and his 2010 federal conviction for mailing threatening communications to his attorney. Count I charged Jason with stalking while restricted by a court order, second offense, stating:

> Jason on or about June 8, 2012 through October 14, 2012, . . . did purposefully engage in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to, or the death of, that person or a member of that person's immediate family, while he had or should have had knowledge that the person would be placed in such reasonable fear by the course of conduct, and his course of conduct did induce such fear in the person, to wit: In violation of two no-contact orders, [Jason] sent [Courter] nineteen emails, requested to "friend" her on Facebook, posted four messages on her Facebook page and left two threatening voicemail messages at her place of employment, all in an effort to resume their relationship, the above beginning only nine days after [Jason's] discharge from federal supervision for Mailing Threatening Communications in which [Courter] was a protected party, and after previously being convicted of stalking her and violating her [no-contact order sixty-five] times. [Jason's] actions caused [Courter] to be very afraid for her physical safety, caused

her to seal all her college contact data from public view, withdraw from a summer class, and meet with threat assessment teams of college officials and local law enforcement agencies in order to protect herself at school and work.

Counts II and III each charged Jason with extortion, in violation of section 711.4(3) and/or (4), alleging Jason, on two separate occasions, "did threaten to expose any person to hatred, contempt, or ridicule and/or threaten to harm the credit or business or professional reputation of any person, with the purpose of obtaining anything of value, tangible or intangible." Count II asserted that on or about August 19, 2012, Jason "left a voicemail message at [Courter's] place of employment in which he threatened to send her office embarrassing information unless she responded back to his emails." Count III alleged that on or about October 6, 2012, Jason left another voicemail at Courter's "place of employment stating he was 'really angry' and threatened to tell her employer all her 'dirty information' and 'secrets' in order to embarrass her unless she text messaged or emailed him."

In February of 2013, Jason filed a motion for new counsel, "expressing some dissatisfaction" with his attorney. At a pretrial hearing, the court addressed the motion and appointed Jason new counsel as requested. Thereafter, Jason asked the court, Judge Paul Miller, if he was the permanent judge assigned to his case because another judge had previously been involved in other proceedings, and Judge Miller advised Jason he believed he was "the permanent judge."

At the next hearing in March, Jason requested he be allowed to represent himself. The court ultimately granted his request but with standby counsel.

At a May 2013 hearing, with Judge Miller presiding, Jason's standby counsel sought to withdraw, advising the court Jason had filed disciplinary complaints against him, had inappropriate communications with him, and had indicated he might "pursue a course of defense or procedure that would be unethical, misleading . . . something that we as attorney would not be allowed to do." The court denied the motion to withdraw, noting this was Jason's prior "course of conduct," "filing ethics complaints against his lawyers when he became displeased with them for whatever reason." The court noted if it proceeded as Jason wished, the case would never get tried. Jason was displeased and interrupted the court, and the court advised Jason of courtroom protocol regarding speaking and told Jason he would ask him when he wanted him to respond. In response, Jason threatened to "file judicial qualification complaints on [the judge] to the disciplinary board" and stated, "I can get a new judge. Motion for change of judge." Judge Miller told Jason he was not going to recuse himself and was the judge "until someone above [him told him] otherwise. You don't get to pick your judge."

At a July 2013 hearing, Jason stated he had filed a motion "for change of judge" and was going to write a letter to the Sixth District Chief Judge Grady and get Judge Miller "off this case," declaring Judge Miller was "causing way too many problems in this case." Jason continued to speak over the court, stating, "I've already filed a judicial qualification complaint, and [the judge] should definitely get the hell off of this case. I've had enough." The court advised Jason of the required conduct and decorum needed for Jason to proceed to represent

himself, and the court stated it may reconsider letting Jason proceed pro se. Jason complied thereafter at this hearing.

However, Jason proceeded to mail a letter to the chief judge requesting a new judge. In his letter, Jason called "the court an idiot, sick pedophile, [and] other derogatory terms using grossly inappropriate language, including a sexually inappropriate drawing." At the next court hearing at the end of July 2013, the court asked Jason why he should be allowed to continue to act as his own attorney. Jason gave a long response, explaining, among other things, that his Asperger's Syndrome affected his "ability to understand court directives," and "because of [his] Asperger Syndrome," he might have acted out "a little bit . . . out of frustration not knowing how to properly address the court" and suggested this was why he might have complained about the judge. The court did not accept Jason's explanation and found that while "Jason may be able to comprehend the legal issues involved in this case," Jason did "not possess the functional abilities and maturity necessary to conduct a defense at a jury trial." The court rescinded and revoked its prior order granting Jason permission to represent himself, and it reappointed standby counsel as Jason's attorney.

At a hearing in October 2013, Jason began talking before going on the record, and the record begins with him stating to the court:

> . . . by sodomizing and forcing my penis on your granddaughter. Can you please remove yourself from the court, please. Thank you.
> I'd ask for recusal of Judge Miller because I'm going to sexually abuse his granddaughter and sodomize her . . . .
> . . . .
> . . . I want a new judge. Please recuse yourself from my proceedings. There's a conflict of interest. I filed a judicial qualifications committee complaint on yourself. You're very

unbiased [sic] and unprejudicial [sic]. And your court reporter has big breasts. That's all.

The court did not take the bait but instead found Jason was seriously disrupting the proceeding and had him removed from the courtroom pursuant to Iowa Rule of Criminal Procedure 2.27(2).

On the day of trial, before jury selection, Jason informed his counsel he wanted to have his case tried to the bench. The court made an extensive record on the issue, stating to Jason, among other things:

> THE COURT: You did actually, throughout this process, file some motions to recuse me. But now you're telling me that it's your desire, your desire, not your lawyers', but your desire, sir, to waive jury and have me be your trial judge?
> [JASON]: Yes, that's correct.

Jason then signed a written waiver requesting the court to accept the jury trial waiver and proceed with a bench trial. The court, after further discussion with Jason, accepted his written waiver, and trial to the bench commenced thereafter.

On April 11, 2014, the court entered its ruling finding Jason guilty as charged on all three counts. The court specifically found the State's expert's testimony to be more credible than the testimony of Jason's expert, and it found the State proved beyond a reasonable doubt that Jason possessed and formed the necessary specific intent required for the corresponding elements in the crimes of extortion. The court noted the habitual offender allegations would be addressed at a later time.

At a later hearing, the court confirmed "Jason was not contesting identity on the two prior convictions, but was contesting the validity of waiver of counsel in the state court conviction." Thereafter, the court found Jason's waiver of

counsel in his 2008 stalking case had been valid. The court concluded the State had proved that both of the alleged prior convictions were prior felony convictions that could be used to enhance Jason's underlying recent convictions under section 902.8.

Jason filed a motion for new trial, claiming, among other things, he did not voluntarily waive his right to a jury trial and Judge Miller should have recused himself. A hearing on the motion, as well as sentencing, was held thereafter, and the court denied Jason's motion in its entirety, noting it found Jason lacked "any credibility." The court proceeded to sentencing, and it sentenced Jason to an indeterminate term not to exceed fifteen years on each count. Pursuant to section 902.8, Jason was required to serve a minimum term of confinement of three years on each count before being eligible for parole. The court ordered that each sentence run consecutively to each other, resulting in a total-indeterminate sentence not to exceed forty-five years. The court stated at length its reasons for the tough sentence, first noting some of Jason's past emails to Courter stating, "I hate you, I wish I could just beat the shit out of you, I mean, make you all black and blue. That would make me feel so good," "I'm away now but I'll be back for you. I'll do everything I can to embarrass you," and "I will ruin your life at all costs." After serving time in prison for this prior conduct, he began the same type of conduct again just nine days after his release. The court also noted that Jason had previously stated "that violating a no-contact order was only a simple misdemeanor, just [thirty] days in jail," and would not stop his actions. The court found Jason showed no lack of remorse for his actions, and prison was necessary based upon his repeated conduct toward Courter. The court had "no

doubt that [Courter] is terrorized by Daniel Jason's continued behavior," and it explained its imposition of consecutive sentences, the maximum sentence available, was "necessary to give [Courter] . . . as much protection as the justice system and this court can give her from Mr. Jason's conduct." The court also

> recommend[ed] to the Iowa Board of Parole that they should not consider release of [Jason] on parole until he has served the maximum term allowed under their rules and regulations or that he has completed all of their recommended mental health treatment requirements and they determine that his release would no longer be a threat to the victim of this charge.

Jason now appeals.

## II.  Discussion.

On appeal, Jason asserts he was denied his constitutional right to an impartial jury trial because his jury-trial waiver was not knowingly or voluntarily made, the court should have recused itself after accepting Jason's jury-trial waiver, and the court denied his right to a jury trial concerning his habitual offender status. He also argues there was insufficient evidence to support his convictions, and the sentences imposed by the court were excessive. We address his arguments in turn.

### A. Right to a Jury Trial.

> The right to a jury trial is, of course, a distinguishing feature of the American criminal justice system. The right to a jury trial allows a group of ordinary citizens, and not a single judge, to determine the factual question of guilt. The right to a jury trial thus has the potential of holding the government in check and preventing government overreaching or persecution. The right to a jury trial is widely accepted as a fundamental constitutional right.

*State v. Feregrino*, 756 N.W.2d 700, 705 (Iowa 2008).

### *1. Jury-Trial Waiver.*

> Iowa Rule of Criminal Procedure 2.17(1) is designed to protect a defendant's constitutional right to a jury trial. The rule provides that criminal "[c]ases required to be tried to a jury shall be so tried unless the defendant voluntarily and intelligently waives a jury trial in writing and on the record. . . ."

*Id.* Consequently, the court must "conduct an in-court colloquy with defendants who wish to waive their jury trial rights." *State v. Keller*, 760 N.W.2d 451, 452 (Iowa 2009) (citation and internal quotation marks omitted). To establish whether a defendant's waiver is knowing, voluntary, and intelligent, the court's colloquy should generally "inquire into the defendant's understanding of the difference between jury and nonjury trials" and advise the defendant of the rights he is waving, including that the jury is composed of twelve members of the community; the defendant may be involved in the jury's selection; the jury's verdict must be unanimous; the defendant will not be rewarded for waiving his jury-trial right; and by choosing to waive a jury trial, it is the court and only the court that will decide the defendant's guilt or innocence. *Id.* at 452 n.1. Whether a defendant adequately waived the right to a jury trial "is a mixed question of fact and law which we decide de novo." *Feregrino*, 756 N.W.2d at 703.

On this issue, Jason claims his waiver was not intelligently made, pointing to his Asperger's Syndrome diagnosis and his courtroom antics. He also maintains his waiver was not voluntary, claiming he only sought a waiver to get out of wearing a shock belt that the court had required. Nevertheless, it is abundantly clear Jason's shenanigans were intelligently calculated in an attempt to produce certain results he wanted—specifically, obtaining a different judge to hear the matter. That Jason was not successful in his endeavors does not

demonstrate his waiver was done unintelligently. Moreover, it was Jason, an intelligent man, who initiated the request to change from a jury to bench trial, and the court discussed with him at length all of the above factors he would be giving up if he chose to proceed, including that Jason would not be rewarded in any way for waiving the right. The court then required Jason execute a written waiver detailing this information, then it went over it again on the record before it accepted his waiver. Reviewing the record de novo, there is no question that Jason's jury-trial waiver was knowingly, voluntarily, and intelligently made.

### 2. Recusal.

Jason also argues the court should have recused itself once he waived his right to a jury trial and proceeded to trial before the court. Jason again cites his offensive behavior and statements, as well as the complaints he filed against the judge, to support his belief the judge was biased against him. Jason has the burden of showing grounds for recusal, and we review the district court's recusal ruling for an abuse of discretion, which only occurs when the court acts on grounds clearly untenable or to an extent clearly unreasonable. *See Taylor v. State*, 632 N.W.2d 891, 893-94 (Iowa 2005).

To be sure, there are "constitutional overtones to a recusal decision in a criminal case because the Due Process Clause requires an impartial judge"; however, "[o]nly personal bias or prejudice stemming from an extrajudicial source constitutes a disqualifying factor." *State v. Millsap*, 704 N.W.2d 426, 432 (Iowa 2005).

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the

judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."

*Liteky v. United States*, 510 U.S. 540, 550-51 (1994) (quoting in part *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)). Consequently, "[j]udicial predilection or an attitude of mind resulting from the facts learned by the judge from the judge's participation in the case is not a disqualifying factor." *Millsap*, 704 N.W.2d at 432. Additionally, "the mere fact the defendant filed a complaint [against the judge] does not automatically require recusal." *Id.* Rather, the test "is whether a reasonable person would question the judge's impartiality," and mere "[s]peculation is not sufficient." *State v. Biddle*, 652 N.W.2d 191, 198 (Iowa 2002). In fact, "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Id.* (citation and internal quotation marks omitted).

Though we do not find any Iowa cases directly on point, several other state and federal courts have addressed the issue of recusal based upon defendants' threats to judges. As one court aptly summarized: "The consensus is that, barring extraordinary circumstances, a defendant will not be allowed to profit from his own misconduct." *Ex parte Bentley*, 849 So. 2d 997, 998 (Ala. Crim. App. 2002) (and cases cited therein). "[E]ven in situations where a defendant lodges a serious threat against a presiding judge, that judge may still decline to recuse himself" at the judge's discretion, thereby curbing the parties'

ability "to use threats as a means of judge-shopping." *State v. Zorn*, 88 A.3d 1164, 1172 (Vt. 2013) (discussing *In re Basciano*, 542 F.3d 950, 956-57 (2d Cir. 2008), and other cases).

Here, there is no indication that Judge Miller found Jason's threats, as disgusting as they may be, credible or that the judge was biased against Jason. Despite Jason's statements and behaviors, which were clearly designed to obtain a different judge, Judge Miller remained both poised and fair throughout the proceedings. The judge directly asked Jason if Jason wanted him, the judge he had been seeking to have recused, to decide his case instead of a jury when Jason asked to waive the jury trial, and Jason explicitly stated he did. Jason failed to show any abuse of discretion on the part of the judge in not recusing himself.

### 3. Habitual Offender Status.

Jason's final jury-trial claim is that the court denied him the right to a jury trial on the habitual offender phase of trial. Though Jason did not contest the identity element of his two prior felony convictions used to enhance his sentence, he maintains he was entitled to have a jury determine the validity of his waiver of counsel in regards to his 2008 stalking conviction. We disagree.

Iowa Rule of Criminal Procedure 2.19(9), which governs the trial of questions involving prior convictions, specifically provides:

> After conviction of the primary or current offense, but prior to pronouncement of sentence, if the indictment or information alleges one or more prior convictions which by the Code subjects the offender to an increased sentence, the offender shall have the opportunity in open court to affirm or deny that the offender is the person previously convicted, or that the offender was not represented by counsel and did not waive counsel. *If the offender*

*denies being the person previously convicted, sentence shall be postponed for such time as to permit a trial before a jury on the issue of the offender's identity with the person previously convicted.* Other objections *shall be heard and determined by the court*, and these other objections shall be asserted prior to trial of the substantive offense in the manner presented in rule 2.11. On the issue of identity, the court may in its discretion reconvene the jury which heard the current offense or dismiss that jury and submit the issue to another jury to be later impaneled. If the offender is found by the jury to be the person previously convicted, *or if the offender acknowledged being such person, the offender shall be sentenced as prescribed in the Code.*

(Emphasis added.) Despite the emphasized language above, Jason contends *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), requires a jury trial be held to "decide the enhancing facts he disputed at the habitual offender trial."

It is true that the Supreme Court in *Alleyne* stated that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." 133 S.Ct. at ___. However, courts since *Alleyne* have repeatedly found that *Alleyne* did not apply to "enhancements based on the fact of a prior conviction." *United States v. Abrahamson*, 731 F.3d 751, 752 (8th Cir. 2013); *see also United States v. Paz-Alvarez*, 799 F.3d 12, 22 (1st Cir. 2015); *United States v. Surratt*, 797 F.3d 240, 248 (4th Cir. 2015); *United States v. Soto*, 794 F.3d 635, 664 (6th Cir. 2015); *State v. Laboy*, 117 A.3d 562, 567-68 (Del. 2015); *State v. Witherspoon*, 329 P.3d 888, 897 (Wash. 2014). Consequently, *Alleyne* is inapplicable here.

Jason did not challenge his identity concerning the two felony convictions, and he was permitted to be heard by the court on his allegation that he did not adequately waive counsel in his 2008 stalking case. The judge thoroughly addressed that claim, and Jason did not challenge that ruling. Jason was not

entitled to any other relief under rule 2.19(9) or *Alleyne*, and his claims that his sentences were illegal for lack of a jury trial on the habitual offender convictions are without merit. For all of these reasons, we conclude Jason's constitutional right to a jury trial was not violated.

### B. Sufficiency of the Evidence.

Sufficiency-of-evidence claims are reviewed for correction of errors at law. *State v. Rooney*, 862 N.W.2d 367, 371 (Iowa 2015). If the record contains substantial evidence, the district court's findings are binding. *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012). If a reasonable factfinder could be convinced the defendant is guilty beyond a reasonable doubt, when viewing the evidence in the light most favorable to the State, the evidence is considered to be substantial. *Rooney*, 862 N.W.2d at 371. "We consider all the evidence in the record and not just the evidence supporting the finding of guilt." *See State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). Moreover, in making our assessment, circumstantial evidence is equally as probative as direct evidence. *State v. Vaughan*, 859 N.W.2d 492, 497 (Iowa 2015). We may defer to the district court's credibility assessments where there is substantial evidence to support the court's findings, since the trier of fact is in a better position to evaluate credibility. *State v. Weaver*, 608 N.W.2d 797, 804 (Iowa 2000).

### 1. Count I—Stalking.

Pursuant to Iowa Code section 708.11(2), when all of the following occur, a person commits stalking:

> a. The person purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person

> to fear bodily injury to, or the death of, that specific person or a member of the specific person's immediate family.
>
> b. The person has knowledge or should have knowledge that the specific person will be placed in reasonable fear of bodily injury to, or the death of, that specific person or a member of the specific person's immediate family by the course of conduct.
>
> c. The person's course of conduct induces fear in the specific person of bodily injury to, or the death of, the specific person or a member of the specific person's immediate family.

"Course of conduct" is statutorily defined as "repeatedly maintaining a visual or physical proximity to a person without legitimate purpose or repeatedly conveying oral or written threats, threats implied by conduct, or a combination thereof, directed at or toward a person." Iowa Code § 708.11(1)(b).

Jason contends the State failed to prove that he knew or should have known Courter received his communications and that she would reasonably be put in fear by them. He also asserts the State failed to prove both that Courter was fearful of him and that her fear was reasonable. He maintains that, "[o]bviously, if [he] did not know the emails were received by Courter, he would not have any reason to know that they would have any effect on Courter whatsoever." Additionally, Jason states there is "no evidence that [he] knew, despite the fact there was a no-contact order in place, that Courter actually did not want him to send her messages." He advances that Courter's "enticing" 2007 emails—emails she sent Jason under police supervision in an effort to arrest him for his actions, which Jason knew, and resulted in his 2008 stalking conviction—indicated she welcomed the communications or at least did not fear bodily injury or death by him. And even if she did have such fears, he basically asserts her fears were unreasonable because he was far away and his emails were polite and non-threatening.

Considering all of the evidence in the record in the light most favorable to the State, there is no question there was substantial evidence for a factfinder to find beyond a reasonable doubt that Jason knew or should have known Courter wanted nothing to do with him, did not welcome his communications, and feared bodily injury or worse as a result of Jason's continued actions and course of conduct, and based upon his actions, a factfinder could find her fear was reasonable. He was previously convicted of stalking her—that conviction alone establishes Jason knew or should have known that any further contact with him would place Courter in reasonable fear of bodily injury to her or worse. Her prior "friendly" emails to him were sent in 2007 by way of a police sting, which Jason knew or later learned. Yet, immediately after he was released from prison, he started sending emails to the email address he knew was hers. His emails indicated he had "googled" her sister and her grandmother; stated he was coming to Iowa to see her in person and at her place of work; called her a "bitch" and asked when she was having her child, among other things. When she did not respond, his conduct escalated, and he started leaving messages with her employer, whom he would have no reason to contact but for Courter's employment there. We affirm on this issue.

### 2. Counts II and III—Extortion.

Section 711.4(3) provides that a person commits the crime of extortion if

the person does any of the following with the purpose of obtaining for oneself or another anything of value, tangible or intangible, including labor or services:

3. Threatens to expose any person to hatred, contempt, or ridicule.

On appeal, Jason asserts the evidence was insufficient to establish he threatened to expose Courter to hatred, contempt, or ridicule but rather merely caused her "to be uncomfortable or embarrassed." He claims his "conduct in sending the two voice mails (although perhaps wrongful in other contexts) reached only the level of bargaining because they did not threaten disclosure of information sufficient to cause others to view the victim with the requisite degree of animosity." He also maintains his "communications were not intended as threats to obtain something of value," stating "the evidence does not prove that, in the context of how his mind operates, which is limited in its ability to gauge what is socially-appropriate conduct, he intended to threaten Courter to achieve something of value."

### i. Threat of Exposure to Hatred, Contempt, or Ridicule.

Jason essentially admits he threatened Courter but argues the threat was not one of exposure to hatred, contempt, or ridicule. He further supports his argument by Courter's coworker's testimony that Jason's revealed information did not cause the coworker to harbor any hatred, contempt, or ridicule of Courter. We think Jason misses the point.

In *State v. Crone*, the Iowa Supreme Court defined "threat," as used in section 711.4, as a "promise of punishment, reprisal, or other distress to," including an act of retaliation. 545 N.W.2d 267, 271 (Iowa 1996). To constitute a "threat" within the statute's meaning, the threat must "be definite and understandable by a reasonable person of ordinary intelligence." *Id.* However, the "threat" "need not be explicit" and "may arise out of innuendo or suggestion." *Id.*

To satisfy this element of the crime, Jason's threat needed only to suggest that what he revealed could expose a person to hatred, contempt, or ridicule, so long as that threat was definite and understandable by a reasonable person of ordinary intelligence. Reviewing this record in its entirety, it is clear that a factfinder could find beyond a reasonable doubt that Jason's threats to expose to Courter's employer, "some really . . . embarrassing information" about Courter, "and all [her] dirty information," and "all [her] secrets," was indeed a threat to reveal information that could subject Courter to hatred, contempt, or ridicule, even without knowing what the information was. Jason's testimony that he was referring to someone else is simply not credible. But for Courter's employment there, he had no reason to contact Courter's office. Moreover, both of his voicemails specifically referenced Courter. Viewing the evidence in the light most favorable to the State, we conclude a factfinder could find the State established this element of the crime beyond a reasonable doubt.

### ii. Intent to Threaten to Achieve Something of Value.

Jason also maintains his threats were not made with the necessary intent to obtain something of value. However, in making this determination, we "look to whether the defendant hoped to obtain anything of value for himself or another." *Id.* at 272. Even though a defendant's threat might only be intended to compel the threatened person to do something that person does not want to do, if the defendant's conduct was "done for the purpose of obtaining something of value for himself or another, that conduct falls within the scope of the statute." *Id.*

Here, Courter wanted nothing to do with Jason. Both voicemails left by Jason demanded Courter contact him or he would reveal her "dirty" and

"embarrassing" information and her "secrets." Jason's threats were intended to compel Courter to contact him, and regardless of his Asperger's Syndrome diagnosis, there is no question that Jason intended to threaten Courter and that Jason knew the demands he left on her employer's voicemail were threats to obtain something of value to him—contact with Courter. Viewing the evidence in the light most favorable to the State, it is clear a factfinder could find the State established this element of the crime beyond a reasonable doubt. Accordingly, we find sufficient evidence supported both of Jason's extortion convictions.

### C. Reasonableness of Sentence.

Finally, Jason challenges the sentences imposed by the court as "excessive." He argues (1) the State suggested an improper reason for imposing consecutive sentences, which the judge did not disavow when imposing consecutive sentences as urged; (2) the sentences imposed were unconstitutional; and (3) the sentences for stalking and two counts of extortion should have been merged. He also asserts the judge should have recused himself from sentencing, for essentially the same reasons previously advanced in his other recusal claim. Because we conclude that claim fails for the same reasons previously found above, Jason failed to show the judge abused its discretion in not recusing himself, we do not address that matter any further.

### 1. Improper Reason for Imposing Consecutive Sentences.

The sentencing court must "state on the record its reason for selecting the particular sentence." Iowa R. Crim. P. 2.23(3)(d). There are many factors the court can consider at sentencing, such as the propensity of the offender and his chances of reform. *See State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002).

However, the court cannot order consecutive sentences simply "to thwart a perceived risk of early parole." *State v. Hulbert*, 481 N.W.2d 329, 335 (Iowa 1992). Rather, the determination of a defendant's minimum sentence rests exclusively with the parole board, and the court cannot use its sentencing decision as a "means for attempting to circumvent this principle." *State v. Remmers*, 259 N.W.2d 779, 785 (Iowa 1977).

We ordinarily review sentencing claims for errors at law. *State v. Gonzalez*, 582 N.W.2d 515, 516 (Iowa 1998). Nevertheless, the "law is clear regarding consideration of impermissible sentencing factors." *State v. Lovell*, 857 N.W.2d 241, 242 (Iowa 2014). We will only remand for resentencing if the defendant "demonstrates an abuse of trial court discretion or a defect in the sentencing procedure such as the . . . consideration of impermissible factors." *Id.* (citation and internal quotation marks omitted). The use of an impermissible sentencing factor is viewed as an abuse of discretion and requires resentencing. *See id.*; *see also State v. Pappas*, 337 N.W.2d 490, 494 (Iowa 1983).

At Jason's sentencing, the prosecutor advised the court:

> In regards to the length of the incarceration that Mr. Jason is facing that many individuals have mentioned as being 55 years, and equating that time with that imposed for murder, the State notes, first of all, that these assertions are not grounded in the reality of Department of Corrections' practices. Each of those convictions carries with it an indeterminate sentence with a mandatory minimum three years and a maximum of 15. The Department of Corrections grants earned time credit of 1.2 days for every day that the Defendant is sentenced to serve. Those—That earned time credit applies to both the mandatory minimums and the maximum sentences. So in this case, for each of the mandatory minimum three years for—with earned time credit, that is now reduced to one year and 132 days. For each count for the mandatory maximum sentence, when applied to earned credit time, it's reduced from 15 years to six years and 298 days. And as of

today, the [Jason] has already been incarcerated for one year and 269 days. So in a matter of addressing what this means for Mr. Jason should he be sentenced to consecutive or concurrent sentences, this is what it means for Mr. Jason. If the Court imposes three counts, which would run concurrently, all three counts, for a total of 15 years, Mr. Jason would be eligible to appear before the Parole Board after one year and four months. He has already exceeded that time by five months. If the Court were to run the two counts consecutively for—or two of the counts consecutively for a total of 30 years, he would be eligible for parole in two years and 265 days. And that would leave Mr. Jason with approximately one year served before appearing before the Parole Board for possible discharge. And if the Court were to run all three counts consecutively for a total of 45 years, the [Jason] would be eligible to appear before the Parole Board for possible discharge in four years and 33 days, leaving him with two years and 129 days left before he could appear before the Parole Board to be eligible for parole.

In its sentencing explanation, the court did not specifically reference any of the prosecutor's statements cited above. However, it did not expressly state it was *not* considering that information.

Jason maintains that *State v. Matheson*, 684 N.W.2d 243, 244 (Iowa 2004), requires we assume the court considered the improper "evidence" because it was not specifically disavowed by the court. However, we do not think that interpretation is demanded here. In *State v. Decker*, 744 N.W.2d 346, 356-57 (Iowa 2008), the Iowa Supreme Court described *Matheson* as follows:

> In *Matheson*, the district court in a sentencing proceeding admitted into evidence a victim impact statement related to an out-of-state crime. 684 N.W.2d at 244. The evidence offered and admitted in Matheson's sentencing proceeding was not admissible for any purpose. *Id*. Further, the improperly admitted evidence in Matheson *contained substantial information not available from any other source. Id*. at 245. Because the district court in *Matheson* did not affirmatively indicate that the harmful evidence was not considered, we vacated the resulting sentence and remanded the case for resentencing before a different judge. *Id*.

(Emphasis added.) We also note that the *Matheson* court observed that

an appellate court is less likely to reverse when improper evidence is introduced in bench trials in which the matter is for a judge's determination rather than for determination by a jury. This is because legal training helps equip those in the profession to remain unaffected by matters that should not influence the determination.

684 N.W.2d at 244 (internal citations omitted).

Sentencing courts are not prohibited from referring to the possible effects of parole practices on the time that a defendant will actually serve. *See State v. Vanover*, 559 N.W.2d 618, 635 (Iowa 1997). In fact, Iowa's truth-in-sentencing provisions require the court to publicly announce that the defendant's term of incarceration may be reduced by earned time and that the defendant may be eligible for parole before the sentence is discharged. *See* Iowa Code § 901.5(9)(a), (b). Here, the sentencing court stated numerous, valid reasons for imposing consecutive sentences. That the court was aware of the implications of time Jason would serve before imposing sentences does not evidence the court relied upon an improper factor in imposing that sentence, despite the fact it did not declare such at the hearing. Accordingly, we conclude Jason failed to establish the court abused its discretion and used an impermissible sentencing factor in its decision to impose consecutive sentences.

### 2. Constitutionality of Sentences.

Jason makes several other arguments concerning the "excessiveness" of his sentences, most framed as violations of his constitutional rights based upon his "mentally ill" status, having been diagnosed with Asperger's Syndrome, and asserting disproportionality of his sentences compared to his non-violent conduct. "When a defendant attacks the constitutionality of a sentence, our review is de novo." *State v. Seats*, 865 N.W.2d 545, 553 (Iowa 2015). "A

sentence is illegal if it amounts to cruel and unusual punishment." *State v. Louisell*, 865 N.W.2d 590, 595 (Iowa 2015).

We first determine whether we infer gross disproportionality in Jason's sentence. *See Graham v. Florida*, 560 U.S. 48, 60 (2010). We consider four general principles, first giving "substantial deference" to the penalties prescribed by our legislature. *See State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012). Second, it is rare that a sentence rises to the level of gross disproportionality. *Id.* Third, "a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender." *Id.* Lastly, a case's unique circumstances can converge and together "generate a high risk of potential gross disproportionality." *Id.* at 651.

Upon our de novo review, we do not find Jason's consecutive sentences to be disproportionate. Our legislature has determined habitual felons are subject to longer sentences than first-time offenders, and we defer to its determination. Additionally, we do not think Jason's Asperger's Syndrome diagnosis makes his sentence disproportionate under the facts of this case. As the experts in the case pointed out, this disorder is a mild and highly-functional form of autism. The court found the State's expert to be more credible, and that expert concluded:

> Although Mr. Jason has a long history of difficulties with social skills, obsessional thinking, and intermittent depressive symptoms, the concurrent documentation from the time of the alleged offenses indicated that these did not rise to such a degree as to leave him unable to form specific intent with regard to the charges of extortion. His actions were not undertaken on an impulse. He considered calling his ex-girlfriend at work, and communicated to her his intent to do so, for approximately two months prior to acting.

Most of Jason's actions previous to and during this case appear to have been tactics intended to manipulate the judicial system to get what he wanted, and whenever something did not go his way, he blamed his Asperger's Syndrome diagnosis. Indeed, his impressive legal knowledge displayed at trial indicates he knew what he was doing in emailing Courter and leaving messages at her place of employment, regardless of his diagnosis. Finally, Jason's minimization of his actions—he "sent her only a total of [nineteen] emails" this time and left "two relatively innocuous phone messages"—after having been arrested and convicted multiple times for his unwanted actions towards Courter and the existence of a no-contact order, supports the court's decision. His repeated disregard of the law evidences he was more deserving of a longer sentence than a first-time offender. We do not find his sentences were disproportionate under the facts of this case.

### 3. Merger.

Jason's final argument is that his sentences were illegal because all three crimes merged into a single offense. *See* Iowa Code § 701.9 (stating "[n]o person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted"). Our review of this issue is for correction of errors at law. *State v. Love*, 858 N.W.2d 721, 723 (Iowa 2015).

"It is well established in Iowa law that a single course of conduct can give rise to multiple charges and convictions." *State v. Velez*, 829 N.W.2d 572, 584 (Iowa 2013). "If the legislature criminalizes two separate and distinct acts, separate sentences on each act are not illegal." *State v. Copenhaver*, 844

N.W.2d 442, 447 (Iowa 2014).  To determine whether an offense is a lesser-included offense—and therefore one that must merge—we employ the "impossibility test."  *State v. Stewart*, 858 N.W.2d 17, 21 (Iowa 2015).  This requires determining "whether it is legally impossible to commit the greater crime without also committing the lesser."  *Id.* (citation and internal quotation marks omitted).

Having set forth the statutory elements of the crimes of extortion and stalking above, we do not repeat them here.  It is clear that the application of the legal elements test plainly demonstrates that stalking is not a lesser-included offense of extortion.  *Compare* Iowa Code § 711.4(3) *with* § 708.11(2).  Most notably, to be convicted of extortion, as charged here, the State was required to prove Jason threatened to expose Courter to "hatred, contempt, or ridicule."  *Id.* Though Jason's overall conduct was related to Courter, he committed separate and distinct acts for which he was subject to punishment.  He left two separate voicemails threatening to reveal information about Courter if she did not contact him.  Excluding those voicemail messages, Jason still would be guilty of the separate crime of stalking, based upon his emails alone.  Because the crimes do not merge, his sentence was not illegal.

### III.  Conclusion.

For all of these reasons, we affirm Jason's convictions and sentences. Any issues raised on appeal and not directly addressed here are without merit.

**AFFIRMED.**